FILED
CLERK

March 13, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
BRAD PACKER, derivatively on behalf of
1-800 FLOWERS.COM, INC.,

                Plaintiff,

            -against-

RAGING CAPITAL MANAGEMENT, LLC,
RAGING CAPITAL MASTER FUND, LTD.,
WILLIAM C. MARTIN, and 1-800-
FLOWERS.COM, INC.,

                Defendants.
------------------------------------------------------------------X

**OPINION
AND ORDER**

15-CV-05933 (JMW)

**A P P E A R A N C E S:**

Glenn Frederick Ostrager, Esq.
Joshua Seth Broitman, Esq.
Roberto Legaspi Gomez, Esq.
**Ostrager Chong Flaherty & Broitman P.C.**
570 Lexington Avenue
New York, NY 10022
*Attorneys for Plaintiffs*

Paul D. Wexler
**Paul D. Wexler, Attorney at Law**
570 Lexington Avenue, 19th Fl.
New York, NY 10022
*Attorney for Plaintiffs*

Thomas J. Fleming, Esq.
Theodore J. Hawkins, Esq.
**Olshan Frome Wolosky LLP**
1325 Avenue of the Americas
New York, NY 10019
*Attorneys for Defendants Raging
Capital Management, LLC,
Raging Capital Master Fund, Ltd.,
and William C. Martin*

Thomas J. Kavaler, Esq.
**Cahill Gordon & Reindel LLP**
80 Pine Street
New York, NY 10005
*Attorney for Defendant 1-800-Flowers.com, Inc.*

**WICKS,** Magistrate Judge:

> *"In its constitutional dimension, standing imports justiciability . . . this is the threshold question in every federal case, determining the power of the court to entertain the suit."*[1]

Standing to bring and maintain a federal lawsuit is rooted in the Constitution.  That is, Article III is the cornerstone of federal court jurisdiction as it restricts the power of the judiciary to resolve only "cases" and "controversies."  The Supreme Court has made clear over the years, most recently in *TransUnion LLC v. Ramirez*[2] that to establish constitutional standing, plaintiffs must show that they suffered an injury and identify the particular concrete harm flowing from that injury.  Courts since *TransUnion* have grappled with the application of that seemingly simple concept in a variety of contexts, such as with the Fair Credit Reporting Act,[3] Fair Debt Collection Practices Act,[4] the Americans with Disabilities Act,[5] and the New York Labor Law,[6] to name a few.  The principle that is clear now, however, is that merely satisfying the statutory standing requirements alone is simply not enough to enter federal court.

---

[1] *Warth v. Seldin*, 422 U.S. 490 (1975).

[2] 594 U.S. ____, 141 S. Ct. 2190, 2203 (2021).

[3] *Rosenberg v. LoanDepot, Inc.*, No. 21-CV-08719 (PMH), 2023 WL 1866871, at *5 (S.D.N.Y. Feb. 9, 2023).

[4] *Bush v. Optio Solutions, LLC*, No. 21-CV-1880 (GRB) (ARL), 2021 WL 3201359, at *3 (E.D.N.Y. July 28, 2021).

[5] *Harty v. West Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022).

[6] *Gillett v. Zara USA, Inc.*, No. 20-CV-3734 (KPF), 2022 WL 3285275, at *6–7 (S.D.N.Y. Aug. 10, 2022).

This Court is now faced with the latest "standing" challenge but in a different statutory context, namely, a derivative action brought under the Securities Exchange Act of 1934 ("Exchange Act").  More specifically, an action brought under Section 16(b)[7] for short-swing trading.  Pre-*TransUnion*, this standing challenge would not have survived given the Second Circuit's clear holding in *Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170 (2d Cir. 2012), *cert. denied*, 569 U.S. 994 (2013) ("*Bulldog*"),[8] a comprehensive decision addressing this very issue.  The question presented here, however, is whether a plaintiff, in a derivative action brought under Section 16(b), in light of the pronouncement in *TransUnion*, has Article III standing to bring and maintain the action.  The parties sharply dispute whether Plaintiff has suffered an injury in fact to support Article III standing in the wake of *TransUnion*.  In resolving this dispute, the Court must necessarily address whether *TransUnion* casts doubt on the continued validity of *Bulldog* under the facts presented here.  This is an issue of first impression.

Before the Court at this not-so-nascent stage of the litigation is Defendants' Motion to Dismiss based upon Plaintiff's lack of constitutional standing.  (DE 107.)  The motion is opposed by Plaintiff.  (DE 109.)  Argument on the motion was held on February 28, 2023.  (DE 112.)

For the reasons that follow, Defendants' Motion to Dismiss for a lack of standing is hereby **GRANTED**.

---

[7] 15 U.S.C. § 78p(b).

[8] Indeed, Defendants early on in this very case did not raise constitutional standing as an impediment to this suit.  (*See* DE 62 at 3 n.2 ("At oral argument, counsel for defendants conceded that the standing argument made in this case is inconsistent with existing Second Circuit law, effectively withdrawing that argument.").)

# I.   <u>BACKGROUND</u>

Plaintiff Brad Packer brings the instant suit, derivatively on behalf of 1-800-Flowers.com, Inc. ("Flowers") against Defendants Raging Capital Management, LLC ("RCM"), Raging Capital Master Fund, Ltd. ("Master Fund"), and William C. Martin for Section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b).  (DE 1.)  Packer seeks disgorgement of profits for the purchase and sale of Flowers' shares by Defendants within a six-month period.  (DE 1.)  Section 16(b) requires a beneficial owner of greater than 10% of shares of an issuer, who purchases or sells the securities of that issuer within a period of less than six months, to disgorge those "short swing" profits.  *See* 15 U.S.C. § 78p(b).

The Court assumes the parties' familiarity with the factual and procedural history of this case.  (*See* DE 40 (Order on Motion to Dismiss); DE 62 (Order on Motion for Summary Judgment); DE 73 (Order on Appeal of Order denying Motion for Summary Judgment).)  The following facts are taken from Plaintiff's Complaint (DE 1), and the parties' filings with respect to Defendants' Motion to Dismiss (DE 107-10).

Defendants are allegedly beneficial owners of more than 10% of Flowers' Class A common stock with junior voting rights.  (DE 108.)  In a six-month period between 2014 and 2015, Defendants bought and sold shares of Flowers and made short-swing profits.  (DE 1.)  During the relevant time period, Defendants owned shares amounting to approximately 1% of voting power necessary to elect Flowers' Board of Directors and Defendants did not hold seats on the board.  (DE 108.)  Plaintiff Packer was a Flowers' shareholder for the relevant time period.  (DE 108.)

On October 15, 2015, Plaintiff filed a derivative suit on behalf of Flowers against Defendants for violating Section 16(b).  (DE 1.)  The parties consented to then-Magistrate Judge

Brown's jurisdiction to conduct all proceedings and enter final judgment.  (DE 27-28.)

Thereafter, the parties engaged in discovery, and cross-moved for summary judgment.  (DE 51,

53.)  On August 20, 2019, Judge Brown denied Defendants' motion for summary judgment and

granted Plaintiff's cross-motion for summary judgment.  (DE 62.)  On appeal, the Second Circuit

reversed and remanded because genuine issues of material fact remained as to the question of

Defendants' beneficial ownership.  (DE 73.)

Subsequently, the parties filed a proposed pretrial order, which was approved for filing.

(Electronic Order, dated May 26, 2021.)  After changing quite a few hands, this case was

ultimately reassigned to the undersigned.  (DE 102.)  Defendants had re-engaged in summary

judgment motion practice, but that motion was deemed withdrawn without prejudice to its

renewal in light of the anticipated reassignment.  (DE 102.)  At the October 18, 2022 status

conference, a briefing schedule was set for Defendants' Motion to Dismiss on the threshold

question of Article III standing under *TransUnion* and the impact of that decision, if any, on the

Second Circuit's decision in *Bulldog*.  (DE 103.)

The fully briefed Motion to Dismiss was filed on January 20, 2023.  (DE 107-10.)  The

parties appeared for an in-person oral argument before the undersigned on the motion on

February 28, 2023.  (DE 112.)

## II.    DISCUSSION

Though Defendants do not specify under which rule this motion is brought, the Court

considers Defendants' Motion to Dismiss as one made under Rule 12(h)(3), which states: "If the

court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the

action."  Fed R. Civ. P. 12(h)(3).  The standards under Rule 12(h)(3) and 12(b)(1) are cut from

the same cloth, in that they both require the application of an identical standard.  *See Greystone*

*Bank v. Tavarez*, No. 09-CV-5192 (SLT), 2010 WL 3325203, at *1 (E.D.N.Y. Aug. 19, 2010)

("Except for the pre-answer limitation on Rule 12(b)(1) motions, the distinction between a Rule 12(b)(1) motion and a Rule 12(h)(3) motion is largely academic, and the same standards are applicable to both types of motions.").

The party seeking access to federal court always carries the burden of establishing Article III standing by "a preponderance of evidence that it exists." *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In assessing the Court's subject matter jurisdiction, the Court is free to consider evidence outside of the pleadings. *See id.* at 113. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

Before addressing the merits of the motion, a review of the legal framework for Article III standing, in general, and in Rule 16(b) cases in particular, is warranted.

## A. The Legal Framework

### i. Article III Standing

Article III standing is a jurisdictional defense that cannot be waived and indeed may be asserted, by parties or the court, at virtually any stage of a litigation. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). The issue of standing is raised by Defendants only now -- eight years into this litigation -- as a direct result of the Supreme Court's landmark decision in *TransUnion*, which clarified the analysis that the district courts must apply to determine constitutional standing.[9]

---

[9] Plaintiff briefly hints at what resembles a waiver argument (*see* DE 109 at 1–2 & n.1), however that argument is without merit. The Court is obligated to consider constitutional standing before considering the merits. "The federal courts are under an independent obligation to examine their

Article III of the Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion*, 141 S. Ct. at 2203 (quoting *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)). The essence or "core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That is, standing is precisely "what it takes to make a justiciable case." *Steel Co.*, 523 U.S. at 102. Standing is derived from that limitation and rooted in the "idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

The judicial power derived from Article III "exists only to redress or otherwise to protect against injury to the complaining party." *Warth*, 422 U.S. at 499. The "irreducible constitutional minimum of standing" has three elements. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff "must show (i) that [the plaintiff] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct at 2203 (citing *Lujan*, 504 U.S. at 560–61). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). A "particularized" injury "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

## ii.    Standing in the Wake of *TransUnion*

The judicial landscape on standing following *TransUnion* has markedly changed. Cases brought under federal statutes that may have wound their way through the courts years ago, are now viewed at the outset through the lens of *TransUnion*. Some have argued that indeed

---

own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines." *United States v. Hays*, 515 U.S. 737, 742 (1995) (internal quotation marks omitted).

*TransUnion* interferes with Congressional powers.  *See, e.g.*, Note, *Standing in the Way: The Courts' Escalating Interference in Federal Policymaking*, 136 Harv. L. Rev. 1222, 1243 (2023) ("The Supreme Court could retreat from its recent intrusions on the congressional power to confer standing, perhaps by rephrasing or otherwise limiting the reach of its most aggressive pronouncements of standing limits.").

The thrust of *TransUnion* appears on its face simple, as recognized by the Second Circuit: "No concrete harm, no standing."  *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 62 (2d Cir. 2021) (quoting *TransUnion*, 141 S. Ct. at 2200).  Yet, application of this concept has yielded varying results, demonstrating that although simple in concept, the application can be quite challenging.  *See, e.g.*, *Krausz v. Equifax Info. Servs., LLC*, No. 21-CV-7427 (KMK), 2023 WL 1993886, at *8 (S.D.N.Y. Feb. 14, 2023) (standing under the FCRA); *Rosenberg v. LoanDepot, Inc.*, No. 21-CV-08719 (PMH), 2023 WL 1866871, at *5 (S.D.N.Y. Feb. 9, 2023) (no standing under FCRA); *Panebianco v. Selip & Stylianou, LLP*, No. 21-CV-5466 (DRH), 2022 WL 392229, at *2 (E.D.N.Y. Feb. 9, 2022) (standing under the FDCPA); *Snyder v. LVNV Funding LLC*, No. 21-CV-7794 (CS), 2023 WL 1109645, at *7 (S.D.N.Y. Jan. 30, 2023) (no standing under the FDCPA); *Frawley v. Med. Mgmt. Grp. of New York, Inc.*, No. 21-CV-8894 (VSB) (SLC), 2022 WL 17812697, at *5–6 (S.D.N.Y. Apr. 25, 2022) (standing under the ADA); *Harty v. West Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022) (no standing under the ADA).

To be "concrete," the injury must be "de facto," which means it must "actually exist" and must be "real" rather than "abstract."  *Spokeo*, 578 U.S. at 340.  Tangible harms such as physical or monetary harms readily qualify as concrete injuries.  *TransUnion*, 141 S. Ct. at 2204.  These can be identified with relative ease.  "Intangible harms" are also considered sufficiently concrete

when they are traditionally recognized intangible harms such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id*. at 2204.  This list is certainly not exhaustive; other intangible harms can also be concrete.  *See* 2 James M. Wagstaffe, *The Wagstaffe Group Practice Guide: Federal Civil Procedure Before Trial*, § 24-III, 24.22 (2022) (collecting cases regarding injuries that have been found to satisfy the injury-in-fact requirement).

The bedrock of the concrete injury inquiry is whether the alleged injury "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341).  With respect to Congressional enactment of statutes to redress certain harms, *TransUnion* explained that Congress's views on whether a particular harm is sufficiently concrete to constitute an injury in fact "may be instructive" and that courts are required to afford appropriate respect to "Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id.* at 2204.

*TransUnion* has made clear that even though Congress possesses the power to "elevate" pre-existing harms to "actionable legal status," it lacks the power to "simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id*. at 2205.  Standing is derived from that limitation and rooted in "the idea of separation of powers." *See id*. at 2203.

*Au fond*, the lesson from *TransUnion* is that "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*. at 2205.  Allegations of a statutory violation alone are insufficient.  *See Maddox*, 19 F.4th at 62 ("In sum, *TransUnion* established

that in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm: 'No concrete harm; no standing.'" (quoting *TransUnion*, 141 S. Ct. at 2214)).  Something more is required.  Moreover, "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a *separate* concrete harm." *TransUnion*, 141 S. Ct. at 2211.

There is not a more apt example of *TransUnion*'s impact than what can be found in the Second Circuit's consideration and reconsideration of the *Maddox* case.  The *Maddox* case involved an action based on an alleged delay by the lender in recording the satisfaction of a mortgage in violation of two New York state mortgage-satisfaction-recording statutes, N.Y. Real P. Law § 275; N.Y. Real P. Actions & Proc. L. § 1921.  The issue of standing was raised pre-*TransUnion*, the court ruled, and then reconsidered its Opinion after *TransUnion*.

In its first decision in *Maddox*, the court noted that "a lender's delay in recording the satisfaction of a mortgage typically creates a cloud on title of real estate," and an action to clear a clouded title was a remedy traditionally recognized under New York common law.  *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, No. 19-1774, 997 F.3d 443, 446 (2d Cir. May 10, 2021) ("*Maddox I"*), *opinion withdrawn and superseded on reh'g*, 19 F.4th 58 (2d Cir. 2021) ("*Maddox II"*).  The court also found that such delays are similar to reputational based harms because they create "the false appearance that the borrower has not paid his debt," which harms the borrowers' reputation by making him look less creditworthy.  *Id*. at 446–47.  For this analogy, the court took note of the common-law analogue to reputational harm caused by publication of false information.  *Id*.

On rehearing, in *Maddox II*, the Second Circuit *withdrew* its prior opinion in light of *TransUnion*. The court noted that *TransUnion* eliminated the "substantive" versus "procedural" distinction that the Second Circuit had developed following *Spokeo*, "since *TransUnion* eliminated the significance of such classifications, which had been a preoccupation." *Maddox II*, 19 F.4th at 64. The court acknowledged that *TransUnion* clarified that the harm the statute protects is of "little (or no) import" in the analysis of concrete harm, it is the harm to the plaintiff that matters. *Id.* at 64 n.2. The court noted that "the determinative standing issue [was] whether the Maddoxes suffered a concrete harm due to the Bank's violation." *Id.* at 64.

*Maddox II* recognized *TransUnion*'s holding that "in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation or risk of future harm: 'No concrete harm; no standing.'" *Id*. (quoting *TransUnion*, 141 S.Ct. at 2214). Indeed, not until that risk of future harm has materialized, will there be standing in such suits. *Id*. at 65 ("True, the Maddoxes may have suffered a nebulous risk of future harm . . . but that risk, which was not alleged to have materialized, cannot not form the basis of Article III standing."). The Second Circuit has since reiterated that "*TransUnion* now makes clear that the 'material risk' standard applies only with respect to injunctive relief and that 'in a suit for damages[,] mere risk of future harm, standing alone, cannot qualify as a concrete harm.'" *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022) (first quoting *TransUnion*, 141 S. Ct. at 2210–11; and then citing *Maddox II*, 19 F.4th at 64).

The *Maddox* duo provide a unique before and after snapshot of the Second Circuit's position with respect to the standing analysis in the wake of *TransUnion*. A violation of the statute alone there was initially found sufficient to support standing under then-existing

precedent.  Following *TransUnion*, not so.  Concrete harm to the plaintiff -- now the required

showing -- was missing.

      **iii.**     **Section 16(b) and the *Bulldog* Decision**

      The fundamental goal of the Exchange Act is to "insure the maintenance of fair and

honest markets."  *Kern Cnty. Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591

(1973).  Congress sought to effectuate that goal through the enactment of Section 16(b).

Section16(b) is designed to prevent and curb insider trading by three classes of individuals, the

issuer's "directors, officers, and principal stockholders."  *Bulldog*, 696 F.3d at 174 (finding the

purpose of the statute is "to prevent an issuer's directors, officers, and principal stockholders

'from engaging in speculative transactions on the basis of information not available to others.'"

(internal quotation marks and citations omitted)); *see also* Arnold S. Jacobs, *Section 16 of the

Securities Exchange Act*, § 3:3 (Sec. Law Handbook Ser. 2023) ("Congress intended to curb

manipulation and unethical practices that result from the misuse of important corporate

information.  Section 16(b) was designed to protect outside stockholders against short-swing

speculation by insiders.").  The prohibition found in Section 16(b) is considered a flat-rule

establishing strict liability without regard to whether the violator did in fact trade using inside

information.  *Bulldog*, 696 F.3d 174.  That is, for a violation to occur, it is enough that short-

swing trading took place during the proscribed period.  *See id*. ("Congress determined that the

'only method . . . effective to curb the evils of insider trading was a flat rule taking the profits out

of a class of transactions in which the possibility of abuse was believed to be intolerably great.'"

(quoting *Reliance Elec. Co. v. Emerson Elec. Co.,* 404 U.S. 418, 422 (1972)).

Under Section 16(b), corporate insiders, which includes beneficial owners that hold more than 10% of a corporation's shares, must disgorge profits obtained from buying and selling, or from selling and buying, the corporation's shares within a six-month period.  *See* 15 U.S.C. § 78p(b).  Section 16(b) creates a private right of enforcement for issuers of the stock or, in certain situations, shareholders on behalf of the issuer.[10]  *See id.*

In *Bulldog*, the Second Circuit held that short-swing trading by a 10% beneficial owner of securities in violation of Section 16(b) causes an injury to an issuing corporation sufficient to support Article III standing.  *Bulldog*, 696 F.3d at 180.  There, the defendant engaged in short-swing trading while a 10% beneficial owner of the issuing corporation's stock.  *Id*. at 173.  The defendant argued that the derivative plaintiff failed to allege any actual injury to establish Article III standing.  *Id.* at 172.  *Bulldog* unequivocally held that through Section 16(b) Congress created a fiduciary duty upon statutory insiders and granted the corporation a legal right to expect them to refrain from any short-swing trading.  *Id*. at 177.  "The deprivation of this right establishes Article III standing."  *Id*.  *Bulldog* noted that "[w]hile this particular legal right might not have existed but for the enactment of § 16(b), Congress's legislative authority to broaden the injuries that can support constitutional standing is beyond dispute."  *Id*. at 180.

Irrespective of the focus in pre-*TransUnion* decisions on the speculative harm that may or not be caused in any individual case from insider trading -- which is the harm Section 16(b) protects against -- that speculative risk cannot in the wake of *TransUnion* automatically support Article III standing in a suit for damages.  Thus, even if some courts have framed the concrete

---

[10] Flowers did not pursue this action on its own behalf, and the parties do not dispute that Packer has followed the statutory pre-requisites to file a derivative suit on Flowers' behalf.  *See* 15 U.S.C. § 78p(b) (allowing any "owner of any security of the issuer" to bring suit "if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter").

harm associated with a Section 16(b) violation as grounded in the risk of harm, that framing does not pass muster now under *TransUnion*.

### B. Application to the Facts

Defendants submit simply that in the wake of *TransUnion* and subsequent Second Circuit authority, the "legal theories that underpin" *Bulldog* are no longer valid.  (DE 110 at 2–3.)  In short, Defendants ask for dismissal based upon *TransUnion*, and urge this Court to ignore *Bulldog* as effectively overruled by *TransUnion*.  (*See* DE 109 at 11.)

In support of the proposition that a Section 16(b) violation alone is sufficient to support Article III standing, Plaintiff relies principally on three cases: (1) *Bulldog*; (2) *Gollust v. Mendell*, 501 U.S. 115, 122 (1991); and (3) *Klein v. Cadian Capital Mgmt.*, *LP*, No. 15-CV-8140 (ER), 2017 WL 4129639 (S.D.N.Y. Sept. 14, 2017) ("*Klein* I"), *vacated on other grounds and remanded*, 906 F.3d 215 (2d Cir. 2018) as well as the Second Circuit's subsequent decision in *Klein*.  According to Plaintiff, these decisions collectively stand for the proposition that once all of the statutory standing requirements are met under Section 16(b), then standing exists and the inquiry ends.  And that is because Congress, according to Plaintiff, recognized that under certain circumstances, a fiduciary duty is statutorily created and if the prohibited conduct occurs, there is a real risk of harm, and that reputational harm is presumed.  (*See* Transcript of Oral Argument at 22:18–23:12, Feb. 28, 2023 (hereinafter, "DE 114") ("[T]rading is reputational harm, equal sign . . . . And reputational harm is sufficient, which is what Congress said, which is what the Supreme Court said, and what the 2nd Circuit said.").)

Nothing more need be alleged or established by a plaintiff, so says *Bulldog*.  Importantly, each of these decisions pre-date *TransUnion*.  As to *TransUnion*'s effect on *Bulldog*, that forms the basis of the spot of bother on this motion.  That is, should *TransUnion* be read so as to

effectively invalidate *Bulldog*'s holding which would otherwise bind this Court under principles

of stare decisis?  Stare decisis[11] means that districts courts are bound by the decisions of their

respective Circuit Courts of Appeal, "unless there is an intervening Supreme Court or *en banc*

panel circuit decision that casts doubt on the controlling precedent."  *Hoeffner v. D'Amato*, 605

F. Supp. 3d 467, 481 (E.D.N.Y. 2022) (alteration and internal quotation marks omitted).  The

intervening decision does not have to address an *identical* issue as the circuit court did, however,

"there must be a 'conflict, incompatibility, or inconsistency' between the Supreme Court's

decision and circuit precedent."  *Id*. (quoting *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808

F.3d 144, 155 (2d Cir. 2015)).  "Unless a subsequent decision of the Supreme Court so

undermines circuit precedent that it will almost inevitably be overruled, the district court must

follow the circuit's decision."  *Id*. (alteration and internal quotation marks omitted).  Here,

*Bulldog* on its face is no doubt controlling.  However, *TransUnion* and progeny also no doubt

cast doubt on that controlling precedent.

   *Bulldog*'s grant of standing once a violation of Section 16(b) is alleged, without a

showing of concrete harm beyond that violation, must yield to the principles announced in

*TransUnion*.  Here, Plaintiff fails to point to or articulate any actual reputational harm to Flowers

flowing from Defendants' breach of Section 16(b).  Plaintiff's argument that a violation of

Section of 16(b) caused reputational harm, even if said violation went unnoticed by all, cannot

support Article III standing.  Not only is the Complaint bereft of any actual injury allegations

---

[11] Justice Benjamin Cardozo remarking on adherence to precedent, made the poignant observation that "[i]f judges have woefully misinterpreted the mores of their day, or if the mores of their day are no longer the mores of ours, they ought not to tie, in helpless submission, the hands of their successors."  B. Cardozo, *The Nature of the Judicial Process* 152 (1921).  This concept is the very foundation of our judicial system as envisioned by our founders.  *See The Federalist No. 78* (Publius, a.k.a. Alexander Hamilton) (May 28, 1788) (noting that in order to "avoid arbitrary discretion . . . [judges] should be bound by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them.").

(*see* DE 1), neither the opposition papers (*see* DE 109) nor oral argument (*see* DE 114) identified any.

Indeed, Plaintiff takes his argument even further -- bluntly positing that *TransUnion* simply has no effect on *Bulldog*.  (*See* DE 114 at 27:14–16 ("And I don't think *TransUnion* makes a particle of change to this particular case.").)  Instead, Plaintiff offers his own interpretation of *TransUnion*, as a case with limited applicability, geared toward only certain types of cases and statutes.  (*See* DE 114 at 31:2–8 (describing the principles in *TransUnion* as an attempt to limit the number of plaintiffs in actions under "statutes like these credit reporting acts and the environmental cases").)

Plaintiff avers that "[i]t requires a wild leap of imagination to find any connection between [*TransUnion* and *Maddox*] and standing under Section 16(b)."  (DE 109 at 14.)  This argument has no legs to stand on.  These decisions leave little to the imagination.  Neither of the decisions cabined their holdings to the statutes at issue in the respective cases.  *TransUnion* in no uncertain terms repeatedly stated: "No concrete harm, no standing."  *TransUnion*, 141 S. Ct. at 2205.  A statutory violation, of whatever statute, does not automatically establish injury in fact unless the plaintiff has suffered concrete harm.  *See id.* at 2205.  That holding is not tethered to any specific statute.  And the Court lacks the power to impose such a limitation into that decision, especially where one clearly was not intended.

The parties do not identify, nor has the Court independently found, any decision squarely addressing *TransUnion*'s application to Section 16(b) of the Exchange Act, *yet*.  The closest to the mark is District Judge Jesse Furman's decision a year ago in *City of Providence, Rhode Island v. Bats Glob. Markets, Inc.*, No. 14-CV-2811 (JMF), 2022 WL 902402, at *1, 18

(S.D.N.Y. Mar. 28, 2022), which involved Section 10(b)[12] of the Exchange Act and cites to *TransUnion*.  The court did not expressly analyze the impact of *TransUnion* on the Exchange Act.  There, the plaintiffs alleged that the defendants "sold certain products and services to high-frequency trading ("HFT") firms — thereby purportedly giving the HFT firms an advantage over [p]laintiffs and the investing public — and failed to fully disclose the effects of these products and services to the market."  *City of Providence*, 2022 WL 902402, at *1.  The court found that the plaintiffs lacked standing since one could not identify any relevant trades that were made on its behalf, and as to four defendants, the plaintiffs could not point to evidence that a transaction causing actual harm occurred on any of those defendants' exchanges.  *Id.* at 18 (citing *TransUnion*, 141 S. Ct. at 2208).  The court stated that Plaintiffs were simply unable to point to any admissible evidence showing that plaintiffs' own trades were allegedly harmed by the defendants conduct, and thus, there was no injury-in-fact to support standing.  *Id*. at 19.

Plaintiff also relies on *Klein v. Qlik Techs., Inc.*, 906 F.3d 215, 220 (2d Cir. 2018), *cert. dismissed*, 139 S. Ct. 1406 (2019) ("*Klein II*").  In *Klein II,* the Second Circuit reiterated its holding in *Bulldog.  See Klein v. Qlik Techs., Inc.*, 906 F.3d 215, 220 (2d Cir. 2018) ("We have previously found that there is a case or controversy in a Section 16(b) case so long as the party bringing suit is either the corporation that issued the securities in question or a current security holder of that corporation." (citing *Bulldog*, 696 F.3d at 175)).  Nonetheless, that decision provides little guidance on the issue before the Court as it is certainly no indicator of the Second Circuit's view of *Bulldog* post-*TransUnion*.[13]

---

[12] *See* 15 U.S.C. § 78j(b).

[13] Plaintiff also enlists *Klein I* and *Myovant* in support of his argument.  This reliance is unavailing since both cases applied a standing test derived from *Spokeo* -- a test that has been since clarified by *TransUnion*.  In *Klein I*, the injury resulting from a violation of Section 16 (b), the court states, was the damage to the corporate issuer's "reputation of integrity and the marketability of its stock" due to insider

Plaintiff next latches onto this idea that if this Court finds no standing, such a result would undoubtedly require ignoring the Supreme Court's precedent in *Gollust v. Mendell*, 501 U.S. 115 (1991).  (DE 109 at 1.)  That is not so.  In *Gollust*, the Supreme Court in a unanimous decision, merely held that a plaintiff had statutory standing to sue under Section 16(b) even after that plaintiff's interest in the issuing corporation was exchanged during a merger for stock in the new corporate parent of the issuing corporation.  *Gollust*, 501 U.S. at 117–18.  There, the Court concluded that Section 16(b) only required a "plaintiff security holder to maintain some financial interest in the outcome of the litigation."  *Id*. at 126.  "[T]he stake of a parent company stockholder" satisfied continued standing and was consistent with Section 16(b) given "the congressional policy of lenient standing."  *Id*. at 127.  *Gollust* takes only a brief detour into Article III standing by noting that allowing a security holder to maintain a Section 16(b) action after losing all financial interest in the outcome of the litigation would raise "serious constitutional doubt" as to Article III standing.  *Id*. at 125–26.

Though *Gollust* addressed a somewhat familiar factual situation, a derivative plaintiff's standing under Section 16(b), it tackled a materially different legal issue -- *statutory* standing.

---

trading, which is a "serious breach."  *Klein I*, 2017 WL 4129639, at *6.  In *Myovant*, the court found that since *Bulldog* concluded that Section 16(b) violations "carry a high risk of harm to the interest that Congress sought to protect," and "[i]n the vocabulary of *Spokeo* . . . were found to present a 'real risk of harm,'" *Bulldog* satisfied the "two-pronged test for standing to sue for bare procedural violations that the Second Circuit Court of Appeals has used after *Spokeo*."  *In re Myovant Scis. Ltd. Section 16(b) Litig.*, 513 F. Supp. 3d 365, 371 (S.D.N.Y. 2021)  (quoting *Spokeo*, 578 U.S. at 340).

When asked at oral argument, Plaintiff expressly admitted that his theory of harm to Flowers does not rest on a risk of harm.  (DE 114 at 18:17–20 (stating that Plaintiff's theory of harm rests not on a risk of harm and asserting: "No. There was actual harm.").)  Thus, Plaintiff's reliance on *Klein I* and *Myovant*, which characterize the sufficiency of standing under Section 16(b) post-*Spokeo* based on the risk of harm to the interest Congress sought to protect, lend no support to his argument whatsoever.  Nonetheless, a risk of material harm can no longer support concrete injury in a suit for damages.  *See* discussion *supra* II.A.iii.

Even *Klein II* makes clear that *Gollust* was merely a "statutory standing," not a "constitutional"

standing decision. *See Klein*, 906 F.3d at 221 (discussing *Gollust*, 501 U.S. at 122). As the

Second Circuit explained there, "[t]he Supreme Court has since clarified that what has been

called statutory standing in fact is not a standing issue, but simply a question of whether the

particular plaintiff has a cause of action under the statute." *See Klein*, 906 F.3d at 221 (internal

quotation marks omitted).

   *Gollust*, to the extent it addresses the existence of a cause of action under Section 16(b),

has little applicability to the instant question of constitutional standing as far as concrete harm is

concerned. Indeed, *Bulldog* even recognized as much. *See Bulldog*, 696 F.3d at 176 n.5 ("[W]e

do not understand [*Gollust*] to hold that such an interest is alone sufficient to demonstrate Article

III standing in the absence of injury to the real party in interest, the issuer. Satisfaction of that

standing requirement appears to have been undisputed and assumed in *Gollust*."). Whether

Packer has met the statutory pre-requisites to maintain a Section 16(b) suit is not the issue before

the Court on this motion. Thus, *Gollust* is not implicated or affected by the issues before the

Court now.

   The Second Circuit has since *continued* to recognize the significant impact of

*TransUnion* on the standing analysis. The Second Circuit has even applied *TransUnion* to cases

involving the Americans with Disabilities Act ("ADA"). In both *Harty* and *Laufer*, the Court

rejected testers' attempts to hinge standing on violations of the statute without adequately

showing concrete harm beyond that violation. In *Harty*, the tester alleged that since the

defendant's "website d[id] not comply with the ADA, the website infringed his right to travel

free from discrimination." *Harty v. West Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022).

Plaintiff, however, did not allege any concrete plans to use the website to make future travel

plans and since he asserted no such plans, he could not simply allege that his ability to travel was concretely harmed. *Id.* The court also rejected plaintiff's argument that he suffered an "informational injury" resulting from the deprivation of necessary information to make his travel choices because he did not allege any "downstream consequences from failing to receive the required information." *Id.* at 444. Notably, the court flatly rejected plaintiff's attempt to create injury due to alleged discrimination by the conditions present on the website. *Id.* The court found that the complaint failed to specify how the website violated the ADA and discriminated against persons with disabilities. *Id.* And the court doubled down, stating that even if Congress had labeled all violations of the act as discrimination, "*TransUnion* makes clear that a statutory violation alone, however labeled by Congress, is not sufficient for Article III standing." *Id.* at 444 (citing *TransUnion*, 141 S.Ct. at 2205.)

In *Laufer*, the court rejected a similar argument because the plaintiff did not have any concrete plans to visit the location. *See Laufer v. Ganesha Hospitality LLC*, No. 21-995 (PWH), 2022 WL 2444747, at *2 (2d Cir. July 5, 2022) (summary order). The court also rejected plaintiff's allegations of "frustration" and "humiliation" resulting from the discriminatory conditions on the website, which the court noted it had similarly rejected in *Harty*. *Id.* at *3. As bare allegations of discrimination in those cases were insufficient standing alone to establish concrete harm -- here too, Plaintiff's argument that a violation of Section 16(b) without a showing of actual reputational harm is enough to establish concrete harm, is insufficient.

The Court finds no reason why, as Plaintiff advances, *TransUnion*'s Article III standing principles would not apply to securities statutes such as Section 16(b). *See* Erwin Chemerinsky, *What's Standing After TransUnion LLC v. Ramirez*, 96 N.Y.U. L. Rev. Online 269, 285–86 (2021) (discussing the possible implications of *TransUnion* on an array of federal statutes that

"create[e] rights where this no common-law or historical analogue" such as the standing under Section 16(b) where "no injury would exist without the statute"). There is no limiting principle in *TransUnion* to the contrary -- nor any contained in Article III. At bottom, the notion in *Bulldog* that a violation of Section 16(b) *alone* sufficiently confers Article III standing upon the issuing corporation or derivative shareholder without more, cannot co-exist with *TransUnion's* pronouncement that a statutory violation and a cause of action *alone* are insufficient to support Article III standing without a showing of concrete harm to the plaintiff. In that respect, *Bulldog* cannot be squared with *TransUnion* and *TransUnion* controls. To be clear, that is not to suggest that a plaintiff could never show concrete harm flowing from a violation of Section 16(b) to support standing, and nothing in this decision should be construed as such. The Court only finds that Packer has not made that showing here beyond the alleged statutory violation.

The Second Circuit's recent decisions applying *TransUnion* indicate to this Court that the Second Circuit would likely come to the same conclusion if presented with the opportunity to re-consider its holding in *Bulldog*. *See, e.g*, *Maddox v. Bank of New York Mellon Tr. Co., N.A*., 19 F.4th 58 (2d Cir. 2021) (withdrawing its prior opinion in light of *TransUnion*); *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022) ("Last Term, the Supreme Court clarified that a plaintiff has standing to bring a claim for monetary damages following a statutory violation only when he can show a current or past harm beyond the statutory violation itself." (first citing T*ransUnion*, 141 S.Ct at 2204–07; and then citing *Maddo*x *II*, 19 F.4th at 63–64)).

### III.   CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss the action for a lack of standing is **GRANTED**, and the case is hereby dismissed.  The Clerk of the Court is directed to enter judgment accordingly.

Dated:  Central Islip, New York                          **SO ORDERED:**
       March 13, 2023

                          /S/ *James M. Wicks*
                              JAMES M. WICKS
                   United States Magistrate Judge